Filed 6/11/26  In re Abigail H. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re ABIGAIL H., a Person Coming Under the Juvenile Court Law. | B350335 |
| ———————————————— | (Los Angeles County Super. Ct. No. 22CCJP03276A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| BRANDI H., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Commissioner. Affirmed.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica J. Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

\* \* \* \* \* \*

Brandi H. (mother) appeals the juvenile court's order terminating her parental rights over her 12-year-old daughter Abigail. Because the trial court did not abuse its discretion in declining to apply the beneficial parent-child relationship exception to the termination of parental rights, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

#### I.   The Family

Mother and Daniel F-H. (father) are the parents of Abigail, who was born in May 2014. Mother has an adult daughter, Aubrey D., from a prior relationship and father has two other children with other women.

#### II.   Conduct Giving Rise to Initial Exertion of Dependency Jurisdiction

Mother was an alcoholic who drank heavily and slept all day. Mother would go missing for days at a time, leaving Abigail in the care of Aubrey, Abigail's paternal aunt, or other relatives. Mother also had a history of engaging in domestic violence with her male companion in Abigail's presence.

2

Father had a history of substance abuse; he used marijuana.  Additionally, father has unaddressed mental health issues.

### III.   Initial Assertion of Dependency Jurisdiction

In August 2022, the Los Angeles County Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over Abigail on the basis of (1) father's mental and emotional problems as well as his history of substance abuse (rendering jurisdiction appropriate under Welfare and Institutions Code section 300, subdivision (b)),[1] and (2) mother's abuse of alcohol and the violent altercations with her male companion (rendering jurisdiction appropriate under section 300, subdivision (b)).[2]

At a combined adjudication and disposition hearing on October 14, 2022, the juvenile court sustained the above-noted allegations, but allowed Abigail to remain in her parents' custody.  The court noted that it was important that mother "maintain sobriety" because this was "a home of parent case." The court ordered mother to participate in enhancement services, including to (1) participate in a drug/alcohol treatment program, (2) undergo weekly drug/alcohol testing, (3) participate in a 12-step program with a sponsor, (4) join a domestic violence support group, (5) complete a parenting class, (6) engage in individual

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     The petition further alleged that mother and father engaged in mutual acts of domestic violence.  The juvenile court did not sustain those allegations.  Because father is not a party to this appeal, we refer to him only as necessary to provide a complete account of the underlying events.

counseling, and (7) ensure that Abigail have no contact with mother's male companion.

In early November 2022, mother tried to pick up Abigail from school while visibly drunk, and later that month tested positive for alcohol in violation of the court's orders. In early December 2022, the Department obtained a warrant to detain Abigail from parental custody, and she was placed with her paternal aunt.

## IV. Supplemental Jurisdictional Petition and Petition for Removal

On December 9, 2022, the Department filed (1) a supplemental petition, pursuant to section 342, again asking the court to assert jurisdiction based on mother and father's history of engaging in violent altercations (rendering jurisdiction appropriate under section 300, subdivisions (a) and (b)), and (2) a supplemental petition, pursuant to section 387, seeking to remove Abigail from parental custody based on mother's alcohol abuse and her failure to comply with court orders.

On February 9, 2023, the Department filed first-amended petitions pursuant to sections 342 and 387, adding a further allegation that father's history of substance abuse and positive drug tests placed Abigail at risk of harm.

On February 21, 2023, the court sustained the amended supplemental petitions.

On May 22, 2023, at a continued disposition hearing, the court removed Abigail from her parents' custody, placed Abigail with the paternal aunt, ordered reunification services for both mother and father, and granted them monitored visitation for nine hours per week.

4

## V.    Reunification Period

### A.    *The six-month review period*

Abigail resided in her paternal aunt's care, where her needs were adequately met.  Mother's visitation with Abigail was inconsistent.  Mother failed to confirm several scheduled visits, arrived late to others, and cancelled some altogether, all of which caused Abigail distress.  Abigail was "'angry that [mother w]as not taking responsibility'" for what she did, and was "'tired of waiting for someone not to show'" because mother always left Abigail "'hanging.'"  Abigail was experiencing significant depression, increased behavioral challenges, and attention deficits due to mother's conduct toward her.  At the six-month review hearing in November 2023, the juvenile court found that the mother's progress toward alleviating the causes necessitating dependency was "unsubstantial"; concluded that continued jurisdiction over Abigail remained necessary; and ordered further family reunification services for mother.

### B.    *The six- to 12-month review period*

Mother's visitation with Abigail initially increased in frequency, and Abigail appeared to enjoy her time with mother and to develop trust in her.  As a result, in February 2024, the juvenile court liberalized visitation to permit unmonitored contact.  Following several weekly visits that month, however, mother ceased contact with Abigail for approximately two to three weeks.  Mother later explained that she had been struggling with her own mental health during that period.

In March 2024, Abigail filed a petition under section 388 seeking modification of the juvenile court's visitation orders.  According to Abigail's pediatrician, Abigail's mental health had deteriorated.  Abigail informed her paternal aunt that she wished

5

to end her life because doing so was the only way to stop the anxiety she experienced surrounding visits with her parents. Later that month, school officials sent Abigail home due to suicidal ideations. The court granted Abigail's section 388 petition in part, ordering weekly one-hour monitored visits between mother and Abigail, and conjoint counseling for mother and Abigail to occur in a neutral setting.

At the May 16, 2024, 12-month review hearing, Abigail's attorney notified the court that Abigail did not want to reunify with mother (or father). The juvenile court again found that the mother's progress toward alleviating the causes necessitating court intervention was "unsubstantial" and concluded that continued dependency jurisdiction over Abigail remained necessary. The court found "that it[ was] in [Abigail's] best interest to give [mother] another six months of time to reunify with [Abigail]," and ordered additional family reunification services for mother.

### C.    *The 12- to 18-month review period*

In July 2024, Abigail informed the social worker that she did not want to reunify with mother because she was afraid mother would live with someone who would mistreat her. Abigail declined all efforts to initiate conjoint counseling with mother. At a progress hearing in September 2024, Abigail told the court that she wanted to continue living with her paternal aunt, and that she did not "trust" her parents. Abigail felt comfortable and safe in the paternal aunt's home, where her needs were fully met.

The quality of mother's visits during this period fluctuated markedly, ranging at times from appropriate and positive to inconsistent and of questionable benefit to Abigail. Abigail enjoyed her visits with mother and had begun conjoint counseling

6

with her, but when asked in late September 2024 whether she wished to begin unmonitored visitation with mother, Abigail declined, stating that she did not want to, asserting, "'No'" as her "'final say.'" Abigail's mental health deteriorated once more, and she again expressed suicidal ideations. She refused to allow mother to transport her alone to the conjoint counseling sessions explaining that she "'d[id] not want to be alone in the car with [mother] at all'" because "'anything could happen.'" Following a seemingly positive visit in November 2024, Abigail reported that she enjoyed spending time with mother but added that it was "'bad that she is not the person I want to be with.'"

In advance of the review hearing, Abigail filed a declaration stating, "[W]hen I lived with my mom, my mom would forget about me. She would leave me at home alone . . . or would forget to pick me up from school or other places . . . Now that I live with my aunt, I know that someone will always be there to pick me up. [¶] . . . [¶] In a perfect world I would live with my aunt permanently . . . I love my parents, but I can't trust them and I don't feel safe with them . . . I do not want to live with [mother]."

At the February 11, 2025, review hearing, the court heard testimony from the social worker and the paternal aunt. The court terminated mother's reunification services after finding that she had made only partial progress in her case plan.

## VI. Termination of Parental Rights

The Department recommended that Abigail be adopted by her paternal aunt and uncle as her permanent plan. Abigail had been placed with them since December 2022; they expressed a desire to adopt her; and she regarded her cousins in the home as her brothers. When asked if she had any fears about being

7

adopted, Abigail responded, "'No, I 100 . . . no 101% want to be adopted.'"

Mother's visitation with Abigail through July 2025 was generally positive. However, mother also sent text messages to Abigail expressing that Abigail's decision to be adopted by her paternal aunt "'kills her,'" which caused Abigail significant emotional distress, as she feared Mother might harm herself.

At the permanency planning hearing on October 21, 2025, the juvenile court found Abigail to be adoptable, identified her paternal aunt and paternal uncle as her prospective adopters, and terminated mother's (and father's) parental rights. The court expressly found that the beneficial parent-child relationship exception did not apply to bar termination because (1) mother did not "consistently visit[] Abigail throughout the pendency" of the case, (2) mother did not establish that she had "a substantial emotional attachment to Abigail," and (3) termination of mother's parental rights "would not be so detrimental that it would outweigh the benefits of the adoptive home [Abigail] will have with her paternal aunt."

## VII. Appeal

Mother filed this timely appeal.

## DISCUSSION

Mother argues that the juvenile court erred in not applying the beneficial parent-child relationship exception.

## I. Pertinent Law

Once a juvenile court has terminated reunification services, the court "shall terminate parental rights" if it finds, "'by clear and convincing evidence[,] that it is likely that the [child] will be adopted'" within a reasonable time. (§ 366.26, subd. (c)(1); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.) Thus, a

8

juvenile court must terminate parental rights and order adoption unless the parent opposing termination proves that one of six statutory exceptions applies. (§ 366.26, subds. (c)(1) & (c)(1)(B); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, overruled in part on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

The exception at issue here is the beneficial parent-child relationship exception. Because the exception "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child," a court will find the exception applicable only if the parent "establish[es]" "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

In assessing whether the termination of parental rights would be detrimental to the child "when balanced against the countervailing benefit of a new, adoptive home" (the third element), a court is to examine "how the child would be affected by losing the parental relationship" entirely. (*Caden C.*, *supra*, 11 Cal.5th at pp. 633, 636.) This is necessarily a "subtle, case-specific inquiry." (*Id.* at p. 633.) We review a juvenile court's findings regarding the third element (balancing of detriment versus benefit) for an abuse of discretion. (*Id.* at pp. 639-641.)

## II.    Analysis

Even if we assume for purposes of argument that mother maintained regular visitation and contact with Abigail (the first element), and that mother had a relationship with Abigail that

9

would benefit her (the second element), the juvenile court did not abuse its discretion in determining that the advantages Abigail would gain through adoption outweighed any potential detriment resulting from the termination of mother's parental rights (the third element). Abigail's relationship with mother—even if assumed to be beneficial to Abigail—was not strongly so: Despite the bond they had formed that sometimes resulted in good visits, mother repeatedly and consistently disappointed Abigail, and that disappointment repeatedly and consistently damaged Abigail's mental health. This is no doubt why Abigail, time and again, expressed no reservation about being adopted rather than being placed in a legal guardianship—even after the concepts had been explained to her, including by the juvenile court. The benefits to Abigail of remaining in her paternal aunt and uncle's home, by contrast, were strong: Abigail had been in their custody for nearly three years, felt safe and comfortable with them, and had come to view their children (Abigail's cousins) as siblings. In evaluating the relative bonds between Abigail and her mother on the one hand, and Abigail and her prospective adoptive family on the other (*Caden C.*, *supra*, 11 Cal.5th at p. 634), the juvenile court acted reasonably in concluding that the termination of Abigail's sometimes beneficial-sometimes harmful relationship with mother would be a detriment to Abigail when balanced against the wholly positive benefits of her new, adoptive home.

Mother resists this conclusion with what boils down to three arguments.[3]

---

[3] Mother also argues that the juvenile court relied too heavily on Abigail's wishes regarding adoption, but for support quotes the parties' argument to the juvenile court—not the

10

First, mother argues that the Department's indication that it might be in Abigail's "best interest to remain in contact with [mother] post adoption, as long as the interaction is positive" dictates a finding that termination of her parental rights would be detrimental. We disagree. For starters, mother's citation of the Department's comments is selective and ignores the Department's ultimate conclusion that "adoption would allow Abigail to maintain a sense of lifelong stability, consistency, and secure attachment that Abigail needs" and that "a permanent plan less than adoption would be harmful to [Abigail]." All of the Department's comments reflect the reality, explained above, that mother's relationship with Abigail had both positive and negative aspects; the negative aspects can reasonably support the juvenile court's ruling that termination of mother's parental rights would not be detrimental to Abigail while the positive aspects can simultaneously warrant the possibility of continued contact after adoption. They are not irreconcilable, or even inconsistent. (See *In re G.H.* (2022) 84 Cal.App.5th 15, 25 [a parent "'who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent'"].)

Second, mother argues that terminating her parental rights would "leave [Abigail] with unresolved residual trauma," which should preclude termination of mother's parental rights. This argument has it backwards. The record supports the finding that it is Abigail's *continued relationship* with mother that continues to inflict that trauma, and that the cessation of that trauma by

court's oral ruling. The court's actual ruling properly examined the *Caden C.* factors.

11

terminating mother's parental rights will be a *benefit* to Abigail rather than a detriment. Accepting mother's argument that children should remain in contact with parents who have inflicted trauma until that trauma is resolved would effectively preclude any termination of parental rights; that is inconsistent with the parental benefit exception being an *exception* instead of the *rule*.

Third and lastly, mother seems to argue that the juvenile court's findings were too "summary" and "brief." This argument lacks merit. There is no "requirement . . . that [a] juvenile court, in finding the [beneficial] parent[-child relationship] exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.)

12

## DISPOSITION

The juvenile court's order terminating mother's parental rights is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, P. J.
HOFFSTADT


We concur:


_____, J.
MOOR


_____, J.
KIM (D.)